IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

QWEST CORPORATION,

    Plaintiff,

vs.                                                                                    Civil No. 05-530 WJ/DJS

BEN R. LUJAN, et al.,

    Defendants,

and

GENERAL SERVICES DEPARTMENT,

    Intervenor.

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS**

THIS MATTER comes before the Court pursuant to Defendants' Motion to Dismiss Plaintiff's Complaint (Doc. 14). Having reviewed the submissions of the parties having considered the parties oral arguments at the February 24, 2006 hearing and being fully advised on the applicable law, I find Defendants' Motion to Dismiss is well taken and shall be granted for the reasons set forth in this Memorandum Opinion and Order.

**BACKGROUND**

Plaintiff Qwest Corporation ("Qwest") is a Colorado Corporation doing business in the State of New Mexico. It is a "telecommunications company" within the meaning of the New Mexico Telecommunications Act ("the Telecommunications Act"). N.M. Stat. Ann. 1978 § 63-9A-3(N). The purpose of the Telecommunications Act is to permit a regulatory framework that

will allow an orderly transition from a regulated telecommunications industry to a competitive market environment.  N.M. Stat. Ann. 1978 sec. 63-9A-2.  The New Mexico Legislature intended in the Telecommunications Act that the encouragement of competition in the provision of public telecommunication services would result in (i) greater investment in the telecommunications infrastructure in the state, (ii) improved service quality and (iii) operations and lower prices for such services.  Id.  Consistent with the Telecommunications Act, Qwest has encountered increasing competition from alternative service providers including other telephone companies, wireless companies and cable companies.

The New Mexico Public Regulation Commission (the NMPRC or the Commission) is an elected, five-member commission created by the Constitution and laws of New Mexico.  See N.M. Const., art. XI, sec. 1; Public Regulation Commission Act, N.M. Stat. Ann. 1978 sec. 8-7-2; see also Public Regulation Commission Act, N.M. Stat. Ann. 1978 sec. 8-8-3(A).  The Commission is responsible for regulating public utilities, including telecommunications companies, in such manner as the New Mexico legislature shall provide.

In March 2000, the New Mexico legislature amended the Telecommunications Act to add the following:

> No later than April 1, 2001, but in no case prior to the adoption of the rules required in Subsection B of this section, the commission shall eliminate rate of return regulation of incumbent telecommunications carriers with more than fifty thousand access lines and implement an alternative form of regulation that includes reasonable price caps for basic residence and business local exchange services.

N.M. Stat. Ann. 1978 sec. 63-9A-8.2(C).  Under this section, the Commission was required to eliminate rate of return regulation with respect to Qwest and to implement an alternative form of regulation ("AFOR") plan with respect to Qwest.  On January 31, 2001, after months of

negotiation, Qwest and the Commission's Utility Division, among other parties, agreed to an AFOR plan for Qwest.  The principal impetus for the AFOR Plan was the Commission's need to satisfy its obligations under the Telecommunications Regulatory Amendments to eliminate rate of return regulation and to implement an alternative form of regulation by April 1, 2001.

In the AFOR Plan, Qwest agreed to invest a total of $788 million in its New Mexico network infrastructure over the five year term of the Plan.  The $788 million investment agreement represented an annual increase in investment of approximately 25% over the annual average investment for 1995 through 1999.  The AFOR Plan stated that "this level of investment is necessary to meet the commitments made in this Plan to increase Qwest's investment and improve its service quality in New Mexico."  Complaint ¶ 19.  The AFOR Plan established numerous specific quality of service standards applicable to Qwest.  The investment agreement included a commitment by Qwest to expand the deployment of digital subscriber line (DSL) service in areas that were not then planned for deployment and that otherwise would not have been served, and also a commitment to deploy integrated services digital network (ISDN) service in ten additional wire centers.  The AFOR plan explained that "through the investment, advanced services and service quality obligations undertaken in the Plan, Qwest will increase and improve the level of service according to the benchmarks stated in this Plan for the communities within its certified service area."  Complaint ¶ 22.  The Commission would not have had lawful authority to order Qwest to invest $788 million in infrastructure as part of the AFOR Plan, but Qwest agreed to make the investment in connection with its commitment to meet applicable service quality standards.

On March 8, 2001, the Commission approved the AFOR Plan in an AFOR Order. In approving the AFOR, the Commission addressed its "authority to consider and approve stipulated agreements entered into by some or all of the parties to a proceeding," finding it "clear that this Commission has the authority to approve stipulated agreements of parties." Complaint ¶ 27. The Commission further stated that "it is equally clear that the Commission Staff has the ability to enter into a stipulation." Id. As agreed to in the AFOR Plan, the AFOR Order obligated Qwest to invest not less than $788 million over the term of the Plan under various terms and time frames. Qwest was also obligated to various service quality commitments it had agreed to in the AFOR Plan.

In approving the AFOR Plan, the Commission commented at length upon the connection between the investment agreement and the service quality objectives. In December 2003, the Commission publicly credited the Qwest AFOR with reducing basic phone rates for most residential customers and stated the view that the AFOR was a positive solution to service quality issues. In December 2004, the Commission characterized the Qwest AFOR as an achievements that "assured competition and investment in telecommunications infrastructure around the state." Complaint ¶ 31.

On July 15, 2004, the Commission opened Case No. 04-00237 to consider "[w]hether Qwest is and will remain in compliance with its AFOR investment obligations, and what, if any remedial measures are necessary to ensure Qwest's compliance with its AFOR investment obligations through the term of the AFOR." Complaint ¶ 32. After receiving testimony and other submissions on this issue, the Commission held four days of hearings in December 2004 and January 2005. The Commission received briefs in January and February of 2005. In a formal

4

open meeting held on March 8, 2005, Commission Chairman Lujan made a motion to have Qwest credit or refund to Qwest's customers any shortfall if Qwest should fail to satisfy its commitment to invest $788 million over the life of the AFOR Plan. The Commission orally approved the motion.

On April 14, 2005, the Commission issued its final order in the matter. Each of the Commissioners voted in favor of the Order. In the discussion portion of the Order, the Commission found that Qwest's investment through July 2004 was $427.8 million or 90% of the investment target for the end of the third year of the AFOR. The Commission noted that Qwest was, at that time, in substantial compliance with the AFOR investment commitment. However, the Commission concluded that the evidence of record indicated that Qwest would not be in compliance with its commitment in the AFOR Order at the end of the AFOR period in March 2006 if the current trend in Qwest's investment expenditures continued. The Commission found that, given current trends, Qwest would be approximately $200 million short of the $788 million it had agreed to invest. The Commission stated that the anticipated shortfall required the commission to address the matter immediately to put a remedial process in place to address the anticipated shortfall.

Qwest argued before the Commission that the investment obligation was tied to, contingent on, or qualified by some of the other AFOR requirements. Qwest also contended that unforeseen and extraordinary changes in the telecommunications industry in the period since the AFOR Order substantially reduced the need for landline infrastructure investments in New Mexico. The Commission agreed that changes in the industry reduced the need for landline infrastructure, that there had been a downturn in the telecommunications sector of the economy,

5

that Qwest's quality of service met or exceeded benchmarks established in the AFOR, and that Qwest was meeting or exceeding its other AFOR commitments. However, the Commission rejected Qwest's contention that its investment obligation was tied to other requirements in the AFOR and Qwest's claim that substantial compliance with the investment commitment would satisfy its obligations under the AFOR. At least one Commissioner commented publicly that the AFOR investment commitment was important for economic development in New Mexico. The Commission projected that Qwest would have invested $564 million at the end of the AFOR period so would be approximately $224 million shy of their AFOR commitment.

In addition to projecting a shortfall, the Commission concluded that the AFOR was more than a private contract; it had become a Commission Order upon its adoption. Thus, it was not simply a voluntary commitment on the part of Qwest. The Commission determined that any shortfall should be refunded to Qwest's New Mexico customers. This was seen as an incentive to Qwest to meet its commitment. The Commission's final order directed a refund of any shortfall but did not resolve the details of such a possible refund.

Qwest filed its Complaint in this case on May 12, 2005 alleging federal question jurisdiction and supplemental jurisdiction over state law claims. In Count I, Qwest alleges that the State of New Mexico deprived it of property in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States because the final order of the Commission is a state imposed financial sanction that is grossly excessive, oppressive, overbearing, arbitrary, serves no legitimate purpose, and is neither reasonable nor proportionate to any wrongdoing by Qwest. Count II alleges that the final order of the Commission violates the Contract Clause of the Constitution of the United States, Art. I, § 10, because the AFOR is a

contract and the final order impairs the obligation of contract by imposing a measure of damages not in accord with the common law measure of damages for breach of contract.  In Count III, Qwest alleges a violation of the Takings Clause of the Fifth Amendment of the Constitution of the United States, applied to the states through the Fourteenth Amendment.  According to Qwest, the AFOR is a contract, contract rights are property, and the final order of the Commission took property from Qwest without just compensation.  Qwest also alleges that the final order effects an unconstitutional taking based upon its massive and exorbitant economic impact, its interference with Qwest's reasonable expectations of its contract rights, and the character of the final order in that it is highly coercive.  Count IV alleges a violation of the dormant aspect of the Commerce Clause of the Constitution of the United States, Art. 1 § 8, because the final order of the Commission is a state regulation of commerce that is discriminatory and unjustifiably burdens interstate commerce.  In Count V, Qwest alleges that the final order of the Commission violates 42 U.S.C. § 1983 because the Commissioners, while acting under color of state law, deprived Qwest of its rights under the Constitution of the United States.  Count VI alleges a violation of the Constitution of the State of New Mexico under several provisions.  Count VII alleges a violation of the Telecommunications Act, N.M. Stat. Ann. 1978 § 63-9A-16(B) and a violation of N.M. Stat. Ann. 1978 § 63-7-1.1 which outlines the powers and duties of the Commission because the Commission lacked authority to order Qwest to issue refunds or credits as a remedy for an alleged violation of the AFOR, the Commission engaged in ex parte communications and did not permit Qwest to respond to the substance of the ex parte communication, because the Commission's final order is arbitrary, capricious and an abuse of discretion, and because these state law provisions create liberty and property interests protected by the Due Process clause of

the Constitution of the United States such that violation of these state laws is also a violation of the Due Process clause. Qwest seeks a declaratory judgment declaring that the Commission's final order violates both state and federal law and cannot be enforced against Qwest.

Defendants filed the instant motion to dismiss arguing that the Johnson Act, 28 U.S.C. § 1342, bars this Court from exercising subject matter jurisdiction over Qwest's claims. Defendants also urge that the Court lacks subject matter jurisdiction under the Rooker-Feldman doctrine and pursuant to the 11th Amendment of the Constitution of the United States. Defendants assert that Qwest's claims are not ripe for adjudication because Qwest has failed to exhaust its state remedies. Defendants contend that this Court should abstain in this case based on the Original Jurisdiction, Burford and Younger doctrines. Finally, Defendants argue that Qwest's claims are barred by the doctrines of issue preclusion and waiver because Qwest did not object to the original 2001 AFOR Order sought to be enforced by the Commission's 2005 final order.

**LEGAL STANDARD**

With regard to Defendants' arguments that this Court lacks subject matter jurisdiction, a party may go beyond the allegations contained in the complaint and challenge the facts upon which jurisdiction depends. <u>Sizova v. National Institute of Standards & Technology</u>, 282 F3d 1320, 1324-25 (10th Cir. 2002); <u>Holt v. United States</u>, 46 F.3d 1000, 1003 (10th Cir. 1995). A Rule 12(b) motion to dismiss can challenge the substance of the complaint's jurisdictional allegation in spite of its formal sufficiency by relying on affidavits or any other evidence properly before the court. <u>Sizova</u>, 282 F.3d at 1324-25; <u>New Mexicans for Bill Richardson v. Gonzales</u>, 64 F.3d 1495 (10th Cir. 1995). A court has wide discretion to allow affidavits or other documents to resolve disputed jurisdictional facts under Rule 12(b). In such instances, a court's

8

reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion. Sizova, 282 F.3d 1324-25; Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).

With regard to the non-jurisdictional issues raised by Defendants, "[a] complaint should not be dismissed for failure to state a claim unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Curtis Ambulance of Florida, Inc. v Board of County Comm'n of the County of Shawnee, Kansas, 811 F.2d 1371, 1375 (10th Cir. 1987). When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the Complaint and construe them in the light most favorable to the plaintiff. Anderson v. State Farm Mut. Auto. Ins. Co., 416 F.3d 1143, 1147 (10th Cir. 2005); Tonkovich v. Kansas Bd. of Regents, University of Kansas, 254 F.3d 941, 943 (10th Cir. 2001).

**DISCUSSION**

I. THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER QWEST'S COMPLAINT PURSUANT TO THE JOHNSON ACT, 28 U.S.C. § 1342.

Under the Johnson Act, a federal district court may not

> enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
> (2) The order does not interfere with interstate commerce; and,
> (3) The order has been made after reasonable notice and hearing; and,
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342. "The Johnson Act sought to remedy the evils of federal court interference with state control of its intrastate public utility rates." U.S. West, Inc. v. Tristani, 182 F.3d 1202, 1207 (10th Cir. 1999). "The Johnson Act was intended to keep constitutional challenges to

9

orders affecting rates out of federal courts lock, stock and barrel, or, as Professor Moore succinctly puts it, to effect a general hands-off policy relative to state rate making." Id. (internal quotations and citations omitted). The Johnson Act deprives a federal court of jurisdiction in actions seeking both declaratory and injunctive relief, and to actions pleaded under 42 U.S.C. § 1983. Id. However, the Johnson Act does not deprive a federal court of jurisdiction unless the challenge is to an "order affecting rates" and each of the four conditions enumerated in the statute is met. Id. The party invoking the Johnson Act bears the burden of showing that each condition is met. Id.

In their motion to dismiss, Defendants urge that the Johnson Act bars this Court from exercising subject matter jurisdiction over Qwest's claims. Qwest contends that the Final Order of the commission is not an order affecting rates, and that two of the enumerated conditions are not met such that its cause of action does not fall within the Johnson Act's bar to the exercise of federal jurisdiction.

> A.   The Final Order of the Commission is an "Order Affecting Rates" Such That the Johnson Act Bars Federal Jurisdiction if the Four Enumerated Conditions Are Met

An order may be one "affecting rates" even if it does not directly result in a rate modification and does not directly involve a rate charged. Hill v. Kansas Gas Serv. Co., 323 F.3d 858, 864 (10th Cir. 2003). All that is required is that the order have an effect on rates. Id. To determine whether an order is one affecting rates, a court is required to examine the "theory of, and the procedures followed under, the applicable statutes governing the formulation of rate structures." Tennyson v. Gas Service Co., 506 F.2d 1135, 1139 (10th Cir. 1974).

Under the New Mexico Constitution, the Public Regulation Commission was given responsibility to regulate public utilities, including telephone, telegraph and information transmission companies, in such a manner as the legislature shall provide. N.M. Const. Art. 11, §§ 1, 2. By statute, the Commission has the power and duty to fix all charges and rates of telephone and transmission companies within the state as well as change, amend and rescind rates. N.M. Stat. Ann. 1978 § 63-7-1.1(A)(1) and (4). In the fixing of telephone company rates, the Commission must give consideration to a company's earnings, investments and expenditures as a whole within the state. N.M. Stat. Ann. 1978 § 63-7-1.1(B).

The New Mexico Legislature passed the New Mexico Telecommunications Act to maintain the availability of access to telecommunications services at affordable rates by encouraging competition in the provision of telecommunications services. N.M. Stat. Ann. 1978 § 63-9A-2. The Commission was directed by the legislature to review all existing rates for public telecommunications services by December 31, 2000, eliminate subsidies, establish consumer protection and quality of service standards, ensure adequate investment in infrastructure, promote availability and deployment of high-speed data services, insure accessibility of interconnection by competitive local exchange carriers, establish an expedited regulatory process, and eliminate rate of return regulation while implementing an alternative form of regulation (AFOR) that includes reasonable price caps. N.M. Stat. Ann. 1978 § 63-9A-8.2.

The 2001 AFOR Order in which Qwest was ordered to invest $788 million in infrastructure implemented Section 63-9A-8.2 by addressing consumer protection and quality of service standards and investment in infrastructure while creating an alternative form of regulation for Qwest, from "rate of return" regulation to "price cap" regulation. The portion of the AFOR

11

requiring Qwest to invest $788 million in infrastructure was an integral and inseparable part of the overall rate plan creating the "price cap" regulation in lieu of the "rate of return" regulation. Thus, it is clear that the 2001 AFOR, including the requirement that Qwest invest $788 million in infrastructure, is an "order affecting rates" for purposes of the Johnson Act. The Final Order which Qwest seeks to enjoin in this litigation is an order designed to enforce the AFOR and, as such, is also an "order affecting rates."

Qwest seeks to avoid this result by distinguishing the Final Order from the AFOR. According to Qwest, it seeks relief only from the Final Order and does not seek relief from the AFOR. Qwest notes that the AFOR only directly tied the average yearly investment to the price cap for the first two years of the AFOR and urges that the price caps are thus not related or affected by the overall five year investment commitment because the AFOR did not contemplate changes in the price caps based on investment levels after the first two years. Qwest urges that it does not seek to challenge the AFOR requirement that it invest $788 million by the end of the AFOR period in March 2006 but only seeks to enjoin the Commission's Order enforcing the requirement by ordering any shortfall to be refunded.

Qwest's argument would be compelling if an "order affecting rates" was required to directly affect rates. As Qwest notes, the AFOR did not address any change in the price cap after the first two years of the AFOR and did not directly tie any price cap change to the average annual investment after the first two years or to the total five year investment. However, the overall investment requirement is an integral part of the overall price cap rate structure contemplated by the legislature in Section 63-9A-8.2 and implemented in the 2001 AFOR. The Final Order challenged in this case is an order of the Commission to enforce the AFOR and any

12

order of this Court with regard to the Final Order would, in actual effect, be an order regarding the AFOR. Thus, the Final Order is an "order affecting rates" for purposes of the Johnson Act.

> B.  Each of the Four Enumerated Conditions of the Johnson Act is Met Such That This Court Does Not Have Jurisdiction Over Qwest's Cause of Action

Defendants contend that each of the four enumerated Johnson Act conditions are met such that this Court lacks subject matter jurisdiction over Qwest's cause of action. Qwest counters that the jurisdiction of this Court is not based solely on diversity of citizenship or repugnance of the Commission's Final Order to the Federal Constitution, and that the Final Order interferes with interstate commerce so does not fall within the Johnson Act's bar to the exercise of federal jurisdiction. Qwest does not dispute that the Final Order in this case was issued after reasonable notice and hearing or that a plain, speedy and efficient remedy is available in the courts of the State of New Mexico. Thus, only the first two conditions are at issue in this case.

> 1.  The Jurisdiction of This Court Over Plaintiff's Action is Based Solely on Diversity of Citizenship or Repugnance of the Final Order to the Federal Constitution Such That the Johnson Act Bars Federal Jurisdiction if the Remaining Enumerated Conditions Are Met

Qwest argues that the first enumerated condition of the Johnson Act is not met because some of its claims are premised on violation of state law. However, a violation of state law is not an independent basis for this Court's exercise of subject matter jurisdiction. This Court might exercise jurisdiction over Qwest's state law claims if jurisdiction were based on diversity of citizenship, 28 U.S.C. § 1332, or if jurisdiction is supplemental to claims over which the court has original jurisdiction, 28 U.S.C. § 1367. If the asserted basis for the Court's jurisdiction over Qwest's state law claims is diversity jurisdiction, the first enumerated condition of the Johnson Act would be met as it includes diversity jurisdiction as well as jurisdiction based on a federal

13

question asserting repugnance to the Federal Constitution. 28 U.S.C. § 1342(1). If the asserted basis for the Court's jurisdiction over the state law claims is supplemental jurisdiction under 28 U.S.C. § 1367, the Court could not exercise such jurisdiction unless it otherwise had original jurisdiction. This brings us back to the question of the basis for the Court's exercise of original jurisdiction, and, if not diversity, it must be a federal question. The only federal questions raised by Qwest assert that the Final Order of the Commission is repugnant to the Federal Constitution. Thus, the jurisdiction of this Court over Qwest's cause of action would be based solely on diversity of citizenship or repugnance of the Final Order to the Federal Constitution, and the first enumerated condition of the Johnson Act is met.

There are no cases to the contrary. The cases cited by Qwest in support of their argument that allegations of state law violations take this case outside of the Johnson Act all involved federal question jurisdiction over claims asserting violations of federal law where the source of federal law was other than the Federal Constitution. See Freehold Cogeneration Assoc. L.P. v. Bd. of Regulatory Comm'rs of New Jersey, 44 F.3d 1178 (3rd Cir. 1995) (suit not barred under Johnson Act when plaintiff alleged that order of commission was preempted by federal statute); Hawaiian Tel. Co. v. Pub. Util. Comm'n of Hawaii, 827 F.2d 1264 (9th Cir. 1987) (suit not barred under Johnson Act when plaintiff alleged that state commission order violated federal commission order). In contrast, several cases in which the Johnson Act precluded the exercise of federal jurisdiction involved state claims in addition to federal question claims alleging that an order was repugnant to the Federal Constitution. See, e.g., Tennyson, 506 F.2d at 1136 n.1, 1143 (Johnson Act barred federal jurisdiction when plaintiff's complaint alleged that utility late

14

charges violated the Federal Constitution as well as Kansas state law). Accordingly, the first enumerated condition of the Johnson Act is met.

> 2. Does the Final Order of the Commission Not "Interfere with Interstate Commerce" Such That the Johnson Act Bars Federal Court Jurisdiction Over Qwest's Action?

In order for a challenge to an "order affecting rates" to be exempt from the Johnson Act due to the order's interference with interstate commerce, the challenged order must have more than an incidental influence or effect on interstate commerce. U.S. West, Inc. v. Tristani, 182 F.3d at 1211. In Public Utilities Comm'n of Ohio v. United Fuel Gas Co., 317 U.S. 456, 469-70 (1943), the Supreme Court held that an order of the Ohio Commission purporting to have authority to fix rates charged by a West Virginia corporation for gas sold to an Ohio gas supplier through interstate pipelines interfered with interstate commerce so was exempt from the Johnson Act. The Court noted, however, that the Ohio Commission certainly had authority to fix rates for gas sold by the Ohio company to the people in Ohio. Id. at 373. "Generally, state agency orders setting intrastate telephone rates do not interfere with interstate commerce." U.S. West, Inc. v. Nelson, 146 F.3d 718, 724 (9th Cir. 1998) (citing Kalinsky v. Long Island Lighting Co., 484 F.Supp. 176, 178 (E.D.N.Y. 1980) and Zucker v. Bell Tel. Co., 373 F.Supp. 748, 751 (E.D. Pa. 1974) aff'd 510 F.2d 971 (3rd Cir. 1975)).

Qwest urges that this Court must assume that the Final Order in this case interferes with interstate commerce because Qwest alleged this in its Complaint, and the Court must assume as true the allegations of the Complaint. As previously noted, this Court must accept as true all the well-pleaded factual allegations in Qwest's Complaint. Anderson v. State Farm Mut. Auto. Ins. Co., 416 F.3d 1143, 1147 (10th Cir. 2005); Tonkovich v. Kansas Bd. of Regents, University of

Kansas, 254 F.3d 941, 943 (10th Cir. 2001).  This does not mean, however, that the Court must accept as true the conclusory legal allegations of Qwest's Complaint.  Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1107 (10th Cir. 2005).

Qwest's Complaint alleges that "The [Final] Order discriminates against and/or impermissibly burdens interstate commerce because it will require Qwest to redirect to New Mexico substantial financial and other resources that would otherwise be dedicated in other states.  The burden imposed on Qwest is clearly excessive in relation to any putative local benefit."  Complaint (Doc. 1) ¶ 90.  The allegation that the order discriminates against or impermissibly burdens interstate commerce is a conclusory legal allegation that the Court need not accept as true.  Elliott Indus. Ltd. P'ship, 407 F.3d at 1107.  The only factual allegation in support of the legal conclusion is that the Order will require Qwest to redirect substantial resources to New Mexico that would otherwise be dedicated in other states.  If an interstate re-allocation of resources were an impermissible burden on interstate commerce or constituted discrimination against interstate commerce, then almost all "orders affecting rates" could be said to be exempt from the Johnson Act.  See U.S. West, Inc. v. Nelson, 146 F.3d at 724 ("Certainly all state rate-making action does have some influence upon or effect upon interstate commerce . . ..").  While Qwest characterizes the potential re-direction of resources as substantial, Qwest

does not allege that it will be required to allocate more resources to New Mexico than it was originally required to invest under the AFOR, and they are not now and have never previously challenged the AFOR as discriminating against or impermissibly burdening interstate commerce. In light of this, Qwest's allegation that the Final Order interferes with interstate commerce is totally without merit.  See Hill, 323 F.3d at 868 (action was not exempt from the Johnson Act based on allegation in plaintiff's complaint regarding one of enumerated conditions because allegation was without merit).  Thus, the Court concludes that the Final Order does not interfere with interstate commerce, the second enumerated condition under the Johnson Act is met, and the Johnson Act bars this Court from exercising subject matter jurisdiction over Qwest's cause of action.  The Court having determined that it lacks subject matter jurisdiction pursuant to the Johnson Act, there is no need to address the other arguments advanced by Defendants in support of their Motion to Dismiss Plaintiff's Complaint.

**CONCLUSION**

For the reasons set forth in this Memorandum Opinion and Order,  Defendants' Motion to Dismiss (Doc. 14) is hereby GRANTED and Plaintiff's cause of action is DISMISSED in its entirety WITHOUT PREJUDICE.

**IT IS SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE

17